**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **KAREN EUBANKS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case number 4:10cv2034 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Karen Eubanks for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.[1]  Ms. Eubanks has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Karen Eubanks (Plaintiff) applied for DIB and SSI in March 2008, alleging a disability as of October 1, 2006, caused by irritable bowel syndrome, depression, diabetes, anxiety, a learning disability, poor circulation in her legs, high cholesterol, spinal damage,

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

acid reflux, and back, neck, shoulder, and vision problems.  (R.[2] at 112-21.)  These applications were denied initially and after a hearing held in October 2009 before Administrative Law Judge (ALJ) Victor L. Horton.  (Id. at 10-23, 21-73.)  The Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Dolores Gonzales, M.Ed., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then 52 years old, married, separated, and living with her brother-in-law.  (Id. at 31-32, 33.)  She has three grown children; the middle child, a son, is twenty-five and lives with her.  (Id. at 32.)  She left school in the tenth grade; she had been in special education classes.  (Id. at 32, 33.)  She has tried three times to get a General Equivalency Degree (GED), but has never succeeded.  (Id. at 32.)   She is 5 feet 4 inches tall and weighs 180 pounds.  (Id. at 33.)  She can read, but does not understand big words.  (Id. at 35.)  She can make change at a grocery store and can write using small words.  (Id. at 35-36.)

Plaintiff last worked in September 2006, at a McDonald's.  (Id. at 37.)  She quit after three months when her future husband was released from prison and when her left hip began to hurt.  (Id.)  She had also done factory work in 1997 to 1998 and 2000 to 2001.  (Id.

_____

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

at 38.)  She had worked at two nursing homes as an assistant, at a delicatessen, at a grocery store and at a filling station as a cashier, and at a school cafeteria.  (Id. at 39-43.)  She was a Tupperware salesperson "just for a period of time."  (Id. at 42.)  She had "had problems getting people to parties."  (Id. at 42-43.)

Asked why she could no longer work, Plaintiff explained that she had problems walking; sitting for any length of time; and with her hips, left knee, back, and neck.  (Id. at 43-44.)  Her neck and entire back have bothered her since she was in a car accident in 1991. (Id. at 44-45.)  She takes ibuprofen and propoxyphene for the pain when she needs it, approximately and occasionally twice a day and at night to sleep.  (Id. at 45-46.)  Also, her left hip and right shoulder hurt.  (Id. at 46-47.)  She stumbles every day.  (Id. at 57.)  She has diabetes and high cholesterol.  (Id. at 48.)  For a brief period of time when she had no money, she stopped taking the medication for her diabetes.  (Id.)  She has bladder problems, acid reflux, and an irritable bowel.  (Id. at 48-49.)  In the evening, she props her left knee up on a pillow or couch.  (Id. at 57-58.)

Plaintiff suffers from depression and takes omeprazole[3] prescribed by her general practitioner.  (Id. at 47, 48.)  The symptoms of depression are that she starts crying suddenly and is unable to work or walk.  (Id. at 53.)  This happens every day for varying lengths of time.  (Id. at 53-54.)  She was physically and emotionally abused by her first and second husbands.  (Id. at 54, 56.)  She bathes every other or every third day.  (Id. at 55.)  She

---

[3]Omeprazole, or Prilosec, is prescribed for treatment of gastric ulcers and gastroesophageal reflux disease.  Prilosec (omeprazole), http://www.medilexicon.com/drugs/prilosec_74.php (last visited Feb. 22, 2012).

forgets thing and has trouble falling asleep and staying asleep.  (Id. at 56.)  She is considering seeing a psychiatrist or psychologist.  (Id. at 47-48.)

Plaintiff smokes "barely" a pack of cigarettes a day.  (Id. at 49.)  Her brother-in-law buys them for her.  (Id.)  She does not drink alcohol or use illegal drugs.  (Id.)  She has a driver's license and occasionally drives.  (Id.)  She cooks and does "a little bit" of the dishes.  (Id. at 49-50.)  She does not vacuum.  (Id. at 50.)  She can stand for approximately fifteen minutes and walk a short distance, but no farther than half a block.  (Id. at 50-51.)  She can lift ten pounds at most.  (Id. at 51.)  Plaintiff explained that her doctor was wrong when he assessed her as being able to sit or stand for two hours at one time; sit for a total of six hours during an eight-hour workday; stand and walk for a total of four; and lift ten pounds frequently.  (Id. at 52, 53.)

The VE testified that Plaintiff's work at McDonald's was as a dining room attendant and was classified as medium, unskilled work, but was light work[4] as she performed it.  (Id. at 59-60.)  Her job as a school cafeteria worker was light, semi-skilled.  (Id. at 60.)  Her job as a cloth winder at a factory was medium, unskilled; as a grocery cashier was light, semi-skilled; as a nurse's aide or deli worker was medium, semi-skilled; as a convenience store clerk was light, unskilled; and as a production assembler was also light, unskilled.  (Id. at 60-61.)  She had no transferable skills from these jobs.  (Id. at 61.)

The ALJ then asked the VE the following question.

---

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

> [A]ssume a hypothetical individual with the claimant's education, training, work experience and timely ALD.[5]   Further assume the individual can lift/carry 20 pounds occasionally, 10 frequent [sic]; stand/walk six hours out of eight, sit six hours out of eight; climb stairs, ramps occasionally; climb ropes, ladders, scaffolds never; stoop, kneel, crouch occasionally; never crawl; reaching in all directions with the right arm limited to frequent. Would that individual be able to perform past work?

(Id. at 61.)   The VE replied that this person could perform Plaintiff's past relevant work as a school cafeteria worker, convenience store clerk, and production assembler.  (Id.)

If this person needed a stand/sit option with the ability to frequently change positions, the past work as a convenience store clerk would still be available.  (Id. at 62.)

If this person also could understand and carry out simple instructions, non-detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting, and could perform some complex tasks, she could still perform the convenience store clerk position.  (Id.)

If this person in addition to the stand/sit option could maintain concentration and attention for two-hour segments over an eight-hour period; demonstrate adequate judgment to make simple, work-related decisions; and respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, the past relevant work would not be available, but the job of bench assembler, small products

---

[5]The ALJ does not explain what he means by "ALD."

- 5 -

assembler, and bottle label inspector would be.  (Id. at 63.)  These were light, unskilled work.  (Id.)

If this person also had crying spells that could take her off task for an hour and needed to unpredictably prop up her feet up to three times daily, this person would not be able to perform any jobs.  (Id. at 64.)

Asked by Plaintiff's counsel about whether the limitations in Dr. Poetz' report, see pages 17 to 19, infra, were compatible with her past work or any other work, the VE replied that they were not because of the report's conclusion that she would need to be absent about one day a month.  (Id. at 65.)

The VE's testimony was consistent with the *Dictionary of Occupational Titles*.

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and evaluations by health care professionals.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 4 inches and her weight as 150 pounds.  (Id. at 150-59.)  Her ability to work is limited by back, shoulder, and neck problems; irritable bowel syndrome; depression; anxiety; a learning disability; poor circulation in her legs; high cholesterol; vision problems; permanent damage to her spine; and acid reflux.  (Id. at 151.)  These impairments prevent her from standing or walking for long and from lifting things.  (Id.)  They also cause her problems when bending, sitting, and going up and down stairs.  (Id.)  They first interfered

with her ability to work in 1991 and prevented her from working on October 1, 2006.  (Id.)
She also stopped working then because her husband made her quit.  (Id.)  She was going to
be certified for nursing, but her doctor told her she could not do that work after her car
accident in 1991.  (Id.)

On a separate questionnaire, Plaintiff reported that she was unable to work due to
untreated diabetes; back, shoulder, and neck injuries; irritable bowel syndrome; learning
disability; mental and physical abuse; poor leg circulation; anxiety disorders; high
cholesterol; vision problems; acid reflux; hiatal hernia; and osteoarthritis.  (Id. at 133-40.)
She could not sit, stand, or walk for long periods of time; she had no endurance and lacked
physical strength; she shook; and she had pain in her back, neck, shoulder, and stomach.
(Id.)  She can do the dishes if she is feeling okay and can take breaks.  (Id. at 136.)  She can
change bed sheets if she has help lifting the mattress for fitted sheets.  (Id.)  She can do
laundry if she has help carrying the baskets.  (Id.)  She can heat up a meal in the microwave,
but cannot make big meals.  (Id.)  She has problems getting and staying asleep because of
her anxiety and depression.  (Id. at 137.)  The problem has worsened over the past three
months.  (Id.)  She can play a computer game for a short time and, when her vision permits,
watch movies.  (Id. at 137, 138.)  Because of her learning disability, reading is sometimes
difficult and understanding things is hard.  (Id. at 137, 139.)  She can drive and does so
three to five times a week.  (Id. at 138.)  The farthest distance she drives is fifteen miles.
(Id.)  If driving an unfamiliar route, she gets nervous.  (Id.)  Because of her depression, she
sometimes has difficulty leaving her house.  (Id.)  She sometimes has to be reminded to

complete chores.  (Id. at 139.)  Sometimes, she is very sensitive to what people say to her.

(Id.)  She cries every day.  (Id.)

Plaintiff listed ten jobs on a Work History Report.  (Id. at 141-48.)  The longest job

she had held was as a school cafeteria worker.  (Id. at 141.)  She did not list a job as a

salesperson.  (Id.)

The person Plaintiff lived with wrote that he had known her for sixteen years and had

seen her health decline more and more.  (Id. at 149.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her

application.  (Id. at 163-69.)  Since completing the initial Disability Report, her knee was

locking up, making it harder for her to get around; her vision was worse; she was depressed;

and she had bladder issues.  (Id. at 164.)  She had difficulty with a simple task such as

taking a shower and found it harder to complete normal tasks.  (Id. at 167.)

Her current medications included citalopram (for depression), Welchol (for glycemic

control in adults with diabetes mellitus), ACTOS (for diabetes), Januvia (for diabetes),

metformin (for diabetes), Naproxen (for arthritis), Crestor (for high cholesterol),

Oxycodone (for moderate to severe pain), oxybutynin (for bladder control), omeprazole,

ibuprofen, and propoxyphene (for pain).  (Id. at 172.)

An earnings report for the years 1986 through 2006, inclusive, listed earnings in all

but three years.  (Id. at 127.)  Her highest earnings, $11,343, were in 1996; her next highest,

$11,061, were in 1992.  (Id.)  In six of the remaining sixteen years, her annual earnings

were between $5,000 and $10,000.  (Id.)  In eight years, her annual earnings were between

$1,000 and $5,000.  (Id.)  Her earnings in the last reported year, 2006, were $4,905.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological

order and begin with Plaintiff's visit in December 2005 to the John C. Murphy Health

Center of the St. Louis County Department of Health (Murphy Health Center) with

complaints of high cholesterol, diabetes, and leg pains.  (Id. at 187-88.)  She had not been

taking her diabetes medications for nine years.  (Id. at 187.)  She had a normal gait.  (Id. at

188.)  She was prescribed a medication for her hypertension and one, Lexapro (citalopram),

for depression.  (Id.)  She was referred to an eye clinic and was to get laboratory work done.

(Id.)  Four days later, she returned for diabetes education.  (Id. at 185-86.)  Two weeks later,

she went to the eye clinic, was diagnosed with presbyopia,[6] and was to return in one year

or as needed.  (Id. at 183-84.)

In January 2006, Plaintiff returned to the Murphy Health Center with complaints of

weakness, shakiness, and a cough and pain in her left side for the past three days.  (Id. at

181-82.)  Also, she was very fatigued.  (Id. at 181.)  She needed a statement to return to

work.  (Id.)  The examining physician, Ester F. Adabe, M.D., thought that her respiratory

problem was viral.  (Id. at 182.)

Plaintiff went to the emergency room at SSM Health Center on March 7, 2007, with

complaints of vomiting that had begun the night before.  (Id. at 190-97.)  She felt like she

---

[6]Presbyopia is "[t]he physiologic loss of accommodation in the eyes in advancing age . . . ."
Stedman's Medical Dictionary, 1422 (26th ed. 1995).

had a bladder infection.  (Id. at 194.)  X-rays and a computed tomography (CT) scan of her abdomen were normal.  (Id. at 196-97.)

In July, Plaintiff went to the emergency room at St. Elizabeth's Hospital after being choked by her husband.  (Id. at 199-206.)  Her voice was hoarse.  (Id. at 203.)  She was instructed not to go home until her husband had been apprehended by police.  (Id. at 206.)

Plaintiff saw an ophthalmologist, Byron Santos, M.D., in June 2008 about squiggly lines that occasionally had appeared in her vision for the past two years.  (Id. at 264.)  Her eye lids were heavy and droopy.  (Id.)

Plaintiff consulted Robert P. Poetz, D.O., on July 1 for her complaints of urinary incontinence, acid reflux, anxiety attacks, depression, poor sleep, right hip pain, left knee pain from a car accident a few days earlier, poor circulation in her legs, poor sleep, and increasing blurred vision.  (Id. at 243, 247-50, 255-59.)  An electrocardiogram (EKG), chest x-ray, and hip x-rays were normal.  (Id. at 255, 258-59.)  A magnetic resonance imaging (MRI) of her left knee showed degenerative changes and a popliteal cyst, i.e. a Baker's cyst[7]; x-rays of the knee revealed mild hypertrophic spurring.  (Id. at 256-57.)  She was prescribed ACTOSPlus and Xanax.  (Id. at 243.)  Dr. Poetz informed Plaintiff of the test results the next month.  (Id. at 241.)  She asked for a referral to an orthopedist for treatment of the cyst.  (Id.)

---

[7]A "Baker's cyst is a buildup of joint fluid (synovial fluid) that forms behind the knee."  U.S. Nat'l Library of Medicine, Baker's cyst, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002202/ (last visited Feb. 23, 2012).  It is caused by swelling in the knee and, if large, "may cause some discomfort or stiffness . . . ."  Id.

The following month, Plaintiff saw Dr. Santos again.  (<u>Id.</u> at 265.)

Plaintiff was seen by a nurse practitioner in Dr. Poetz' office on October 30.  (<u>Id.</u> at 240, 244-46, 253-54.)  She had a sharp pain in her chest, but no shortness of breath.  (<u>Id.</u> at 240.)  She was also constipated due to the irritable bowel syndrome.  (<u>Id.</u>)  Her diagnoses included the Baker's cyst, gastroesophageal reflux disease (GERD), polyps in her colon, diabetes mellitus, increased lipids, depression, and low back pain.  (<u>Id.</u>)  She was prescribed Vesicare (for bladder control) and Januvia.  (<u>Id.</u>)  Her total cholesterol was 222; high was greater than 200.  (<u>Id.</u> at 244.)  X-rays of her cervical spine revealed degenerative changes at C6-C7 with intervertebral disc space narrowing at C6-C7.  (<u>Id.</u> at 253.)  X-rays of her lumbar spine revealed only bony demineralization.  (<u>Id.</u> at 254.)

After seeing an orthopedic surgeon, Terry J. Weis, D.O., in November, Plaintiff underwent a left knee arthroscopy to repair a torn left medical meniscus.  (<u>Id.</u> at 233-36, 269-71, 278-79.)  She was then taking no medications.  (<u>Id.</u> at 234.)

Plaintiff reported to Dr. Weis on December 1 that she had mild swelling and pain the left knee.  (<u>Id.</u> at 272.)  She was given Relafen (a nonsteroidal anti-inflammatory drug) and prescribed Percocet for discomfort.  (<u>Id.</u>)  Three weeks later, the swelling was gone but a dull, "achy" pain remained.  (<u>Id.</u>)  She was continued on the Relafen.  (<u>Id.</u>)

Plaintiff saw the nurse practitioner in Dr. Poetz' office again on December 30.  (<u>Id.</u> at 239, 251-52.)  She had a pain in her right shoulder that radiated to her neck.  (<u>Id.</u> at 239.)  She was not sleeping.  (<u>Id.</u>)  She had not filled her prescriptions since her October visit.  (<u>Id.</u>)  Chest x-rays were normal.  (<u>Id.</u> at 252.)

Plaintiff reported to Dr. Weis in January 2009 that she continued to have symptoms from degenerative arthritis in her knee.  (Id. at 273.)  She was given an intra-articular injection of  Depo-Medrol and was to return in two weeks.  (Id.)  When she did, she was walking "quite well."  (Id.)  The prescription for Relafen was refilled; she was to return in one month.  (Id.)  She did not keep her next appointment, scheduled two months later.  (Id.)

Shortly after her last visit to Dr. Weis, on February 25, Plaintiff underwent a bilateral external levator resection and upper lid blepharoplasty.[8]  (Id. at 281.)  When Plaintiff saw Dr. Santos the next month, on March 4, she reported that her swelling was less but her vision was still blurry.  (Id. at 266.)  She had run out of her medication that Sunday.  (Id.)

The following month, Dr. Santos completed a Vision Questionnaire on her behalf. (Id. at 267-68.)   The diagnoses was bilateral upper lid ptosis (a sinking down[9]) and dermatochalasis (a loosening[10]).  (Id. at 267.)  The prognosis was excellent.  (Id.)  Without correction, the vision in her right eye was 20/30 and in her left was 20/40; with correction, the vision in her right eye was 20/20 and in her left was 20/20.  (Id.)  Her symptoms were droopy, heavy eyelids; headaches; tunnel vision; a sensation that there was a foreign body in her eyes; and a feeling of tiredness in her eyes.  (Id.)  Her vision problems did not affect her ability to work.  (Id. at 268.)

_____

[8]A blepharoplasty is "[a]ny operation for the correction of a defect in the eyelids." Stedman's Medical Dictionary at 212.

[9]See Id. at 1463.

[10]See Id. at 464.

In May, Plaintiff returned to Dr. Weis with complaints of pain in her left knee and right hip after stumbling four weeks earlier. (Id. at 274-76.) Her medical history included diabetes, bladder infection, and degenerative joint disease in her left knee. (Id. at 274, 276.) She walked with an abnormal gait. (Id. at 276.) She was prescribed medication.[11] (Id.) Two weeks later, she was walking "fairly well." (Id.) She was to return in one month; she did not. (Id.) Rather, she returned in two months with complaints of pain in both hips. (Id. at 277.) She was described as having mild degenerative arthritis in both hips, worse on the left than the right. (Id.) There was good bone density and well-maintained joint spaces. (Id.) There was no subluxation or dislocation. (Id.) Her left knee was not swollen and had a 3 to 90 degrees range of motion. (Id.) She was prescribed Naproxen and was to return in one month. (Id.) She did, and "ha[d] good resolution of the majority of her symptoms. She still ha[d] a dull achy pain in her hips. She ha[d] a straight leg raise to 90 degrees. Patellar and Achilles reflexers [were] intact and equal. Good toe extensor strength." (Id.)

When Plaintiff returned to Dr. Santos in September, she reported that she felt pain when touched in the area below her eyes. (Id. at 280.) She was on diabetes medication; her blood sugar levels were up and down. (Id.) She was to return in one year. (Id.)

Also before the ALJ was the April 2008 report of Elbert H. Cason, M.D., of a consultative examination of Plaintiff. (Id. at 208-14.) Plaintiff's chief complaints were pain in her back, shoulders, neck, and hips; diabetes; poor circulation in her legs; high

---

[11]The name is illegible.

cholesterol; vision problems; and acid reflux disease.  (<u>Id.</u> at 208.)  Plaintiff reported that she had been diagnosed with a permanent disc injury.  (<u>Id.</u>)  She could walk one-half block, stand or sit for ten minutes, and lift ten pounds.  (<u>Id.</u>)  She could bend a little, but could not squat.  (<u>Id.</u>)  She could go up seven steps.  (<u>Id.</u>)  She did not use an assistive device when walking, was not under a doctor's care, and did not take any medications.  (<u>Id.</u>)  She had been told she has arthritis in her shoulders and hips.  (<u>Id.</u>)  She had had diabetes for approximately nineteen years.  (<u>Id.</u>)  She did not check her blood sugar levels.  (<u>Id.</u>)  She was thirsty all the time and had neuropathy in her hands and feet.  (<u>Id.</u> at 209.)  She had had poor circulation in her legs since 2005.  (<u>Id.</u>)  She did not know her cholesterol levels.  (<u>Id.</u>)  She was 5 feet 4 inches tall and weighed 176 pounds.  (<u>Id.</u>)  Her uncorrected vision in her right eye was 20/20; in her left eye, it was 20/50.  (<u>Id.</u> at 209, 212.)  With pinhole correction, the vision in her left eye was 20/25.  (<u>Id.</u>)  She had periodic problems with her kidneys.  (<u>Id.</u> at 209.)

Plaintiff further reported that she lived with a family, occasionally did dishes but no other chores, did not drive, and did not shop for groceries.  (<u>Id.</u>)  She left the house once or twice a week.  (<u>Id.</u>)  She did not sleep during the day and sometimes worked on the computer.  (<u>Id.</u>)  She smoked one pack of cigarettes in one and one-half days.  (<u>Id.</u>)

On examination, her blood pressure was "excellent" at 120/86.  (<u>Id.</u>)  Her straight leg raises were decreased, more so on the left than on the right.  (<u>Id.</u> at 210.)  She could not heel or toe stand or squat.  (<u>Id.</u>)  She walked with a slight limp on her left side.  (<u>Id.</u>)  Her range of motion in her shoulders on flexion and abduction was limited by one-third.  (<u>Id.</u> at 213.)

Her range of motion in her lumbar spine on flexion-extension was 45degrees – a full range was 90 degrees – and on lateral flexion was 10 degrees to the right and left – a full range was 25 degrees.  (Id. at 210, 214.)  Her range of motion in her cervical spine was 10 degrees on lateral flexion, flexion, extension, and rotation.  (Id. at 214.)  A full range on lateral flexion was 45 degrees, on flexion was 50, on extension was 60, and on rotation was 80.  (Id.)

Dr. Cason noted that

[i]f I just touch the skin on her back, she jumps.  This is an exaggerated response.  Attempt of range of motion of the lumbar spine, in my estimation was a very poor effort.  Cervical spine motions greatly decreased, poor effort.  The hip motions were normal.  The ankle motions were normal.  The shoulder motions were decreased, again, this appeared to be a very limited effort put forth to do some of these exercises.  Elbow motions were normal.  Grip strengths were normal.  She could use her fingers for buttoning, writing, using small tools or parts.  The remainder of the musculoskeletal examination was unremarkable.

(Id. at 210.)

L. Lynn Mades, Ph.D., examined Plaintiff the same day as did Dr. Cason.  (Id. at 216-20.)  Plaintiff reported that she had gone through a divorce in 2003 and had been put by her primary care physician on medication for depression.  (Id. at 216-17.)  She had remarried and was now separated from her second husband, who had physically and emotionally abused her.  (Id. at 217.)  She was forgetful and had crying spells, fatigue, anxiety episodes, decreased appetite, and problems sleeping.  (Id.)  Every day, she was depressed.  (Id.)  She was not being treated for any medical problems and was not taking

any medication.[12]  (Id.)  She attended school through the tenth grade, was in special

education classes, and had never obtained a GED.  (Id.)  Her longest period of employment

was for six or seven years.  (Id. at 218.)  On examination, she was casually dressed, well-

groomed, had normal hygiene, was generally cooperative and pleasant, alert, and had good

eye contact.  (Id.)  She walked with a limp.  (Id.)  Her speech was normal in rate and rhythm

and did not include any tangents, flight of ideas, or perseveration.  (Id.)  Her mood was

mildly depressed; her affect was full, occasionally tearful, and generally appropriate.  (Id.)

She appeared to have no problems in her receptive or expressive language ability.  (Id.)  She

had no preoccupations, thought disturbances, delusions, hallucinations, suicidal or

homicidal ideation, or perceptual distortions.  (Id.)  Her flow of thought was logical and

sequential.  (Id.)  She was oriented in all spheres, able to repeat six digits forward, could

name the current and four past presidents but not the current governor or mayor, could

perform simple calculations without difficulty, and had a good ability to assess essential

shared characteristics between objects.  (Id. at 218-19.)  Her expressed verbal judgment was

poor to fair; her insight and judgment were slightly limited to fair; and her proverb

interpretation was poor.  (Id. at 219.)  She was living with her brother-in law, did such

household chores as washing dishes and "taking care of her own space," drove, worked on

the computer, listened to music, and occasionally went out with family members.  (Id.)  She

could take care of her personal needs.  (Id.)  She could maintain adequate attention and

---

[12]This is a puzzling statement given that Plaintiff had seen Dr. Poetz the month before, had been prescribed medications, and refers to him as her primary care physician.

concentration with appropriate persistence and pace.  (Id. at 220.)  She was diagnosed with major depressive disorder, single episode, and had a Global Assessment of Functioning (GAF) of 65.[13]  (Id.)

The next month, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form for Plaintiff.  (Id. at 222-32.)  He concluded that Plaintiff had an affective disorder, i.e., major depressive disorder, mild, single episode, that was not severe.  (Id. at 222, 225.)  This disorder resulted in mild restrictions in her activities of daily living and mild difficulties in maintaining social functioning.  (Id. at 230.)  It did not cause any difficulties in maintaining concentration, persistence, or pace or any repeated episodes of decompensation.  (Id.)

Also in May 2008, Isabel Mora, M.D., reviewed Plaintiff's medical records and concluded that the only supported allegation was depression, for which medication was given for thirty days.  (Id. at 221.)

At her counsel's request, Dr. Poetz, D.O., assessed Plaintiff's physical residual functional capacity in January 2009.  (Id. at 260-63.)  He reported that he saw her about

---

[13]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  "A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

every three months.[14]   (Id. at 260.)   Her diagnoses were diabetes mellitus, GERD, hyperlipidemia, depression, Baker's cyst in the left knee, low back pain, and myalgia.  (Id.) Her symptoms included pain in her left arm and knee, cough, not sleeping, constipation, and low back pain.  (Id.)  She was not compliant with her medications and was addicted to nicotine.  (Id.)  She had a reduced range of motion in her left arm and rales in the right lower quadrant of her lungs.  (Id.)  Her impairments could be expected to last for at least twelve months; emotional factors contributed to their severity.  (Id.)  He did not know whether she was a malingerer.  (Id.)  She suffered from depression, but did not take her medication.  (Id. at 261.)  He could not say whether her impairments were consistent with the limitations and symptoms he described.  (Id.)  Her pain and other symptoms would frequently interfere with her ability to pay attention and concentrate.  (Id.)  She was capable of low stress jobs.  (Id.)  She could walk several blocks without having to rest or experience severe pain; could sit for more than two hours without having to get up; could stand for two hours before having to sit or walk; and could sit for at least six hours and stand or walk for about four hours in an eight-hour workday with normal breaks.  (Id. at 261-62.)  She would need to walk approximately every sixty minutes for five minutes.  (Id. at 262.)  She needed a job that would allow her to shift positions at will.  (Id.)  She did not need a job that would require her to take unscheduled breaks or allow her to elevate her legs with prolonged

_____

[14]The records reflect that Dr. Poetz had seen Plaintiff once, in July 2008, and had been seen in October and December 2008 by a nurse practitioner in his office.  It does not appear that he saw Plaintiff again before completing the assessment.

sitting.  (Id.)  She did not need an assistive device.  (Id.)  She could frequently lift less than

ten pounds, occasionally lift ten pounds, and rarely lift twenty pounds.  (Id.)  She could

occasionally look down or up, turn her head to the right or left, and hold her head in a static

position.  (Id.)  She could occasionally twist but should only rarely stoop, crouch, squat, or

climb ladders or stairs.  (Id. at 263.)  Approximately one day a month, she was likely to be

absent from work due to her impairments.  (Id.)  Asked what was the earliest date that the

description of her symptoms and limitations applied, Dr. Poetz answered December 30,

2008, for the left arm pain and July 1, 2008, for the diabetes, cough, Baker's cyst, and

increase in lipids.  (Id.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation

process, the ALJ first found that Plaintiff met the insured status requirements through

December 31, 2011, and had not been engaged in substantial gainful activity since the

alleged disability onset date of October 1, 2006.  (Id. at 14-15.)  The ALJ next found that

Plaintiff had severe impairments of diabetes mellitus, left knee pain, degenerative joint

disease, and right lumbar pain.  (Id. at 15.)  He further found that there was no supporting

evidence that impairments of GERD, bladder problems, irritable bowel syndrome, a

learning disability, poor leg circulation, visual problems, or high cholesterol would impose

work-related limitations.  (Id.)  Also, her mild depressive disorder did not impose more than

minimal limitations in her ability to perform basic mental work activities.   (Id.)

Specifically, she had mild restrictions in her activities of daily living, mild difficulties in

maintaining social functioning, mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation of extended duration. (Id. at 16.)

Plaintiff's impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity. (Id.)

The ALJ next found that Plaintiff had the residual functional capacity (RFC) to occasionally lift and carry twenty pounds; occasionally climb stairs and ramps, stoop, kneel, and crouch; and frequently reach in all directions. (Id.) She could not crawl or climb ropes, ladders, or scaffolds. (Id.) She needed to frequently alternate between sitting and standing when working. (Id.)

After summarizing Plaintiff's testimony, the ALJ concluded that her statements about the intensity, persistence, and limiting effects of the symptoms of her medically determinable impairments were not entirely credible. (Id. at 17-18.) The ALJ discussed the findings of Drs. Adabe, Cason, Mades, Weis, Poetz, and Santos, and the medical records from the orthopedic surgeon. (Id. at 18-20.) He also noted the assessments by Drs. DeVore and Mora, recognizing that their opinions were not entitled to controlling weight but finding that they must be considered. (Id. at 20-21.) Next, the ALJ considered Plaintiff's "relatively limited history of medical treatment," including the lack of physical therapy, treatment at a pain clinic, and recent emergency room visits; the lack of any opinion from a treating or examining physician that she was disabled or had limitations greater than those listed in the RFC; the inconsistencies in her reports of what medications she was taking and her lack of compliance with the prescribed medications; her sporadic work history; and her "generally

unpersuasive appearance and demeanor while testify at the hearing," e.g., being tearful at one point in the hearing yet displaying no evidence of pain or discomfort or difficulty in understanding and responding to the questions. (Id. at 21-22.) The ALJ also found that, although Plaintiff described very limited daily activities, those activities could not be objectively verified and it was difficult to attribute the limitation to her medical conditions. (Id. at 21.)

With her RFC, Plaintiff could return to her past relevant work as a sales person and convenience store clerk. (Id. at 22.) (Id.) She was not, therefore, disabled within the meaning of the Act. (Id.)

### Additional Medical Records Before the Appeals Council

After the ALJ entered his adverse decision, Plaintiff submitted to the Appeals Council medical records from the Crider Health Center.

Plaintiff consulted a health care provider[15] at the Center on December 17, 2009. (Id. at 283-86.) She reported being depressed for the past several years and having been on Celexa for almost one year. (Id. at 283.) Her depression was an eight on a ten-point scale. (Id.) She had no pleasure in such activities as cooking and doing crafts. (Id.) She had insomnia, a poor appetite, poor concentration, and crying spells. (Id.) She was sluggish and nervous. (Id.) She was staying with a brother-in-law and sleeping on an air mattress. (Id.) She was separated from her second husband, who was abusive and who she married

---

[15]The name is illegible, nor is there any indication of the provider's professional qualifications.

following a divorce from her first husband, who was also abusive.  (Id.)  Her current medications included ACTOS, Januvia, metformin, oxybutynin, omeprazole, Naproxen, Crestor, and Celexa.  (Id. at 284.)  The last, prescribed by her primary care physician, she did not take because it made her feel like she was "'on the cloud.'"  (Id.)  She was partially compliant with the others.  (Id.)  She had been treated with Zoloft and Xanax in 2003 for depression.  (Id.)  She reported that she was unable to work due to hip and knee pain from a 1991 car accident.  (Id. at 285.)  She had been raped when she was thirteen by her girlfriend's brother.  (Id.)  She was raised by her mother and step-father, who was somewhat emotionally abusive.  (Id.)  On examination, she was alert and oriented to time, place, and person; was cooperative; and had a soft voice, fair grooming, restricted affect, logical thought process, intact memory, and fair insight and judgment.  (Id.)  The provider discontinued the Celexa and started Plaintiff on Cymbalta and Trazodone.  (Id. at 286.)

The following month, in January 2010, Plaintiff reported that the Trazodone did not help.  (Id. at 287.)  The dosage was increased.  (Id.)  Her mood was "so so."  (Id.)  She was waiting on an SSI decision and wanted to move out of her sister's house.  (Id.)  There was no evidence of psychosis.  (Id.)  The prescription for Cymbalta was continued; individual counseling was recommended.  (Id.)

In February, Plaintiff was depressed and had been having crying spells.  (Id. at 288.)  She was sleeping better.  (Id.)  She had fair eye contact, fair grooming, a normal rate and volume of speech, a tearful affect, a logical and goal directed thought process, and fair

insight and judgment.  (Id.)  Her Trazodone prescription was renewed; her Cymbalta prescription was increased.  (Id.)  Individual counseling was recommended.  (Id.)

In April, Plaintiff reported that her mood was a "little better."  (Id. at 289.)  She was sleeping well.  (Id.)  Her prescriptions were renewed; individual counseling was recommended.  (Id.)

Xanax was added to Plaintiff's prescriptions in May.  (Id. at 290.)  She was having anxiety attacks and had been nervous, but was sleeping well.  (Id.)

Plaintiff reported in June that she had been feeling unmotivated, was nervous, and was forcing herself to shower daily.  (Id. at 291.)  She was under a lot of stress.  (Id.)  Her best friend had died the week before.  (Id.)  She was not seeing a therapist.  (Id.)  On examination, she was alert and oriented to time, place, and person; was calm and cooperative; had good eye contact; had a normal rate and volume of speech; had spontaneous speech, a depressed mood, and dysphoric affect; had a logical and goal directed thought process; and had fair insight and judgment.  (Id.)  Her prescriptions were renewed and Wellbutrin was added.  (Id.)  Individual counseling was recommended.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous

work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

- 24 -

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions;

(6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national

- 26 -

economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'"  **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not basing his RFC assessment on medical evidence, thereby not posing a proper hypothetical question to the VE, and (2) finding that she could return to her past relevant work based on his improper RFC assessment. The Commissioner disagrees.

As noted above, an RFC must be "'based on *all* the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations.'" **Jones v. Astrue**, 619 F.3d 863, 971 (8th Cir. 2010) (quoting Page v. Astrue, 484 F.3d 10410, 1043 (8th Cir. 2007)) (emphasis added). Thus, there must be "'at least some' medical evidence [to] support the ALJ's RFC determination." **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

The ALJ found that Plaintiff has the RFC occasionally lift and carry twenty pounds; occasionally climb stairs and ramps, stoop, kneel, and crouch; and frequently reach in all directions. She needed to frequently alternate between sitting and standing when working and could not crawl or climb ropes, ladders, or scaffolds. In several respects, this RFC was more restrictive than that of Dr. Poetz, who found that Plaintiff could occasionally lift and

carry no more than ten pounds and could only rarely climb stairs, stoop, and crouch.  Nor did

the ALJ include in his RFC assessment a need to be absent from work one day a month.

When Dr. Poetz assessed Plaintiff's RFC, he had seen her once, in July 2008.  She had complained then of urinary incontinence, acid reflux, anxiety attacks, depression, poor sleep, right hip pain, left knee pain originating a few days earlier, poor circulation in her legs, poor sleep, and increasingly blurred vision.  Tests confirmed only degenerative changes in her left knee and a cyst in that knee.  Plaintiff was referred to an orthopedist for treatment of her knee problems.  Plaintiff was seen by a nurse practitioner at her next two visits to his office; and, at the second of those visits, she reported that she had not had her prescriptions from the first visit filled.  When Dr. Poetz next saw Plaintiff it was for the assessment of her RFC.  He found that emotional factors affected the severity of her impairment, but she did not take her medication for depression.  He could not opine whether her impairments were consistent with her described limitations and symptoms.[16]  Asked to list the earliest date on which the limitations applied, Dr. Poetz was able to answer only for the left arm pain – which appeared more than two years after her alleged disability onset date – and her diabetes, increased lipids, cough, and Baker's cyst – which appeared twenty-one days after her alleged disability onset date and two months after she filed her applications.  Moreover, Plaintiff consistently failed to take the prescribed medication for her diabetes and high lipids and failed to follow

---

[16]See note 14, supra.

- 29 -

up with Dr. Weis for treatment of her left knee.[17]  Plaintiff did not allege disability due to a

cough, nor did she seek treatment for such.[18]

Plaintiff notes that Dr. Poetz' finding that she would need to be absent from work one

day a month foreclosed substantial gainful activity according to the VE.  "A treating

physician's opinion is given controlling weight if it 'is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [a claimant's] case record.'"  **Tilley v. Astrue**, 580 F.3d 675, 679 (8th

Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson**

**v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th

Cir. 2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight,

such an opinion does not automatically control because the [ALJ] must evaluate the record

as a whole."  **Wagner**, 499 F.3d at 849 (internal quotations omitted).  Thus, "'an ALJ may

grant less weight to a treating physician's opinion when that opinion conflicts with other

substantial medical evidence contained within the record.'"  **Id.** (quoting Prosch v. Apfel, 201

F.3d 1010, 1013-14 (8th Cir.2000)).  See also 20 C.F.R. § 404.1527(d) (listing six factors

---

[17]The Court notes that Plaintiff was described as walking "quite well" at her last visit to Dr. Weis and failed to keep a follow-up appointment.

[18]Indeed, Plaintiff seldom sought medical treatment for her cited impairments.  In December 2005, ten months before the alleged disability onset date, she sought treatment for depression and was prescribed medication, cited leg pains but had a normal gait, was prescribed medication for hypertension, reported that she had not been taking her diabetes medication for nine years, and had age-related vision problems.  The next three times, once before her alleged disability onset date, and once five months after, and once nine months after, she sought medical treatment were for unrelated conditions.  The next time she sought treatment for a cited impairment was in June 2008, almost two years after her alleged disability onset date, and was for her vision problems.

to be evaluated when weighing opinions of treating physicians, including supportability and consistency).  The only support in the record for Plaintiff's need to be absent from work one day a month is her own description of her limitations.  As the ALJ properly found that Plaintiff lacked credibility,[19] he did not err by not incorporating in her RFC a limitation based on her subjective complaints.  Additionally, that limitation is conclusory and not supported by Dr. Poetz' one-time examination of Plaintiff or by his office records.  See **Wildman**, 596 F.3d at 964 (holding it was permissible for an ALJ to discount an assessment of a treating physician that consisted of conclusory statements); **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Plaintiff also argues that the ALJ erred by not capturing the concrete consequences of her impairments in his hypothetical question to the VE.  A properly phrased hypothetical question to a VE must "capture the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997); accord **Robson v. Astrue**, 526 F.3d 389, 392 (8th Cir. 2008).  "A hypothetical question is properly formulated[, however,] if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v.

---

[19]Plaintiff does not challenge the ALJ's adverse credibility findings.  Regardless, those findings are supported by the record as argued by the Commissioner.  (See Def. Mem. at 5-7.)

Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).

Plaintiff emphasizes that her depression was not included in the hypothetical question. Plaintiff first complained of depression when she saw Dr. Poetz in July 2008.  When she next saw him, he noted that she did not take her medication.  The ALJ found that her depression was mild and did not impose more than minimal limitations in her ability to perform basic mental work activities.  Clearly, the severity of Plaintiff's depression depends on her description of such; however, the ALJ found her not to be credible.  See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (rejecting argument that ALJ erred in assessing claimant's mental impairments when medical opinion cited by claimant was "largely based" on her own statements); accord **Wildman**, 596 F.3d at 967; **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007).

Plaintiff contends that the ALJ erred by not fully and fairly develop the record.  "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."  **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005).  "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations,' the claimant has received a 'full and fair hearing.'"  **Jones**, 619 F.3d at 969

(quoting <u>Halverson</u>, 600 F.3d at 933).  In the instant case, the ALJ's determination is based on all the evidence in the record.  Additionally, the Court notes that Plaintiff does not cite what issue was undeveloped or what crucial inquiry was not pursued.

Finally, Plaintiff argues that the ALJ erred by relying on the VE's testimony without making an explicit finding as to the mental demands of her past work.  The VE testified that Plaintiff's past work as a convenience store clerk was light and unskilled.  <u>See</u> SSR 82-62, 1982 WL 31386 (1982) (holding that a decision that a claimant can perform past relevant work must include findings as to (1) the claimant's RFC; (2) the physical and mental demands of the past work; and (3) whether the claimant's RFC would permit a return to the past work).  "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to [her] past work."  **<u>Groeper v. Sullivan</u>**, 932 F.2d 1234, 1239 (8th Cir. 1991).  A VE may offer evidence about the physical or mental demands of a claimant's past relevant work, however, "either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R.  § 404.1560(b)(2).  In **<u>Wagner</u>**, 499 F.3d at 854, the Eighth Circuit held that an ALJ could rely on a VE's testimony in determining the demands of past relevant work.  <u>See also</u> **<u>Lowe v. Apfel</u>**, 226 F.3d 969, 973 (8th Cir. 2000) ("Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled.").

In the instant case, the VE testified that, with a need to alternate positions, Plaintiff could perform her past work as a convenience store clerk and that his testimony was consistent with the *Dictionary of Occupational Titles*.[20]  Having found no mental limitations affecting Plaintiff's ability to work, he did not err by not inquiring into the mental demands of her past relevant work.[21]

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted); accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly,

---

[20]Compare **Pfitzner v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), cited by Plaintiff, in which the ALJ did not expressly refer to the *Dictionary of Occupational Titles* and did not refer to any specific job descriptions in the,

[21]The ALJ did err when considering Plaintiff's job as a Tupperware sales person as past relevant work.  Plaintiff testified that she failed in this job because she could not convince people to have the parties during which the Tupperware is sold.  "A job is past relevant work if it was 'done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity.'"  **Moad v. Massanari**, 260 F.3d 887, 892 (8th Cir. 2001) (quoting 20 C.F.R. § 404.1565(a)).  There is no evidence in the record that Plaintiff's job as a Tupperware sales person was substantial gainful activity.  Moreover, the VE did not cite this job as past relevant work, nor did Plaintiff list it in her work history report.

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of February, 2012.